1
2
3
4

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 1420
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail: swestcot@bursor.com

5
6
7
8

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com

9

*Counsel for Plaintiff*

10

11

### UNITED STATES DISTRICT COURT

12

### NORTHERN DISTRICT OF CALIFORNIA

13

14   EDUARDO FLORES, individually and on behalf
     of all others similarly situated,

15                                    Plaintiff,

16

17          v.

18   COSTCO WHOLESALE CORPORATION,

19                                    Defendant.

20

21

22

23

24

25

26

27

28

Case No.

**CLASS ACTION COMPLAINT**

<u>JURY TRIAL DEMANDED</u>

Plaintiff Eduardo Flores ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Costco Wholesale Corporation ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

**NATURE OF THE ACTION**

1.      Nasal decongestants are over-the-counter medications that are marketed to alleviate sinus pressure and sinus congestion.

2.      Defendant has made millions of dollars selling its nasal decongestant product: Kirkland Multi-Symptom Cold & Flu Severe (the "Product").

3.      Defendant markets the Product as having the ability to provide relief to nasal congestion.

4.      Defendant attributes the Product's ability to provide nasal decongestion relief to the inclusion of one active ingredient: Phenylephrine ("PE").

5.      PE, however, is ineffective at providing nasal decongestion relief when it is taken orally.

6.      Indeed, on September 12, 2023, an advisory panel to the U.S. Food & Drug Administration ("FDA") unanimously agreed (16-0) that oral PE is not effective at relieving nasal congestion.

7.      Accordingly, Defendant's marketing and advertising concerning the Product is false, misleading, and likely to deceive the public.

8.      Plaintiff asserts claims on behalf of himself and similarly situated purchasers of Defendant's Product for violations of the California Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, *et seq.*, Unfair Competition Law ("UCL"), Bus. & Prof. Code §§ 17200, *et seq.*, False Advertising Law ("FAL"), Bus. & Prof. Code §§ 17500, *et seq.*,, breach of implied warranty of merchantability, and unjust enrichment.

**PARTIES**

9.     Plaintiff is a resident of San Jose, California, has an intent to remain there, and is therefore a domiciliary of California.

10.     Plaintiff purchased the Kirkland Multi-Symptom Cold & Flu Severe product multiple times.  His most recent purchase was in 2022 at a Costco in San Jose, California.  Before purchasing the Product, Plaintiff reviewed information about the Product, including the representation that the Product would be able to provide nasal congestion relief.  When reviewing the Product label, disclosures, warranties, and marketing materials, Plaintiff understood them as representations and warranties by Defendant that the Product would be able to provide nasal decongestion relief.

11.     Plaintiff relied on Defendant's representations and warranties in deciding to purchase the Product over other nasal decongestant products.  Accordingly, Defendant's representations and warranties were part of the basis of the bargain, in that he would not have purchased the Product on the same terms had he known Defendant's representations were not true.

12.     Contrary to the representations on the Product's marketing materials, the Product was not able to provide nasal decongestion relief.  Plaintiff therefore did not receive the benefit of his bargain.

13.     Defendant Costco Wholesale Corporation is a Washington corporation, with its headquarters in Issaquah, Washington.  Defendant manufactures, markets, and sells the Product throughout the state of California and the United States.

**JURISDICTION AND VENUE**

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiff, as well as most members of the proposed class, are citizens of states different than Defendant.

15.     The Court has personal jurisdiction over Defendant because Defendant conducts

1  substantial business within California, such that Defendant has significant, continuous, and
2  pervasive contacts with the State of California.  Moreover, Defendant has purposefully availed
3  itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of the
4  Defendant's forum-related activities.

5  16.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant
6  transacts significant business within this District and because Plaintiff purchased and used the
7  Product in this District.

8  **FACTUAL ALLEGATIONS**

9  *The Market For Decongestants*

10  17.  The market for products that allegedly relieve nasal congestion is worth over $2
11  billion annually and includes over 250 products.

12  18.  The two leading ingredients used to provide relief from nasal congestion are PE and
13  pseudoephedrine.  These active ingredients are sold as the only active ingredient in some products,
14  and as one of the active ingredients in multi-symptom products.

15  19.  While pseudoephedrine is effective as a nasal decongestant when taken orally, PE
16  accounts for approximately 80% of the market for over-the-counter decongestants.  In the last year
17  alone, nearly $1.8 billion of PE-based decongestants were sold.

18  *Defendant's False Advertising*

19  20.  Defendant markets, sells, and distributes the Product through numerous brick-and-
20  mortar stores as well as online.  On the Product's packaging, Defendant represents that the Product
21  is able to provide relief to "Nasal Congestion."

22  21.  By way of example, the Product is depicted below:

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                3

1
2
3
4
5
6
7
8
9
10



11
12
13
14

22.     By representing that the Product is an effective remedy for "Nasal Congestion," Defendant induced reasonable consumers, such as Plaintiff and the proposed class members into believing that the Product was effective at providing nasal decongestion relief.   Those representations, however, are false and misleading, as set forth in greater detail below.

15

***The Products' Use of Phenylephrine***

16
17

23.     Defendant's Product attributes the ability to provide nasal decongestion relief to one active ingredient: PE.

18
19

24.     Defendant does not attribute nasal decongestant relief to any other ingredient in the Product.

20

***Phenylephrine Does Not Provide Nasal Decongestant Relief When Taken Orally***

21
22

25.     PE is ineffective at providing nasal decongestant relief when taken orally. All available scientific authorities support this conclusion.

23
24
25
26

26.     For example, on May 1, 2006, two professors at the University of Florida, Dr. Leslie Hendeles, PharmD Professor, Pharmacy and Pediatrics, and Dr. Randy Hatton, PharmD FCCP BCPS Clinical Professor, Department of Pharmacotherapy and Translational Research College of Pharmacy published a letter in Journal of Allergy and Clinical Immunology titled: Oral

27
28

phenylephrine: An ineffective replacement for pseudophedrine?[1]   The letter questioned the effectiveness of PE for nasal congestion based upon the results of multiple double blind, placebo-controlled studies, that show PE was no more effective than placebo in reducing nasal airway resistance.  Moreover, the letter notes that the studies relied on by the FDA to approve PE were unpublished, manufacturer-sponsored studies conducted by commercial testing laboratories.

27.    On February 1, 2007, three professors from the University of Florida, Dr. Leslie Hendeles, PharmD Professor, Pharmacy and Pediatrics, Dr. Randy Hatton, PharmD FCCP BCPS Clinical Professor, Department of Pharmacotherapy and Translational Research College of Pharmacy, and Almut G. Winterstein (PhD, Assistant Professor, Department of Healthcare Administration) filed a Citizens Petition with the FDA concerning PE drugs.[2]

28.    As a result of the 2007 Citizens Petition, the FDA's Nonprescription Drugs Advisory Committee met on December 14, 2007 and concluded that the products could continue to be sold, but 9 of 12 of the committee members voted that "new studies on response to higher doses were required."[3]

29.    Scherling-Plough Pharmaceuticals responded to the FDA's Nonprescription Drugs Advisory Committee by conducting a multicenter, phase 2, trial among 539 adults with seasonal allergic rhinitis.  The results of the study revealed no significant differences between placebo and active treatment groups.[4]

30.    In addition, McNeil Consumer Healthcare conducted a pharmacokinetic, safety and cardiovascular tolerability study of phenylephrine.  Similarly, this study revealed no difference in safety endpoints between placebo and 10, 20, and 30 mg of phenylephrine even though systemic exposure increased disproportionately with dose.  "This is noteworthy since both the relief of congestion and systemic endpoints such as change in blood pressure and pulse are mediated by

[1] https://www.jacionline.org/article/S0091-6749(06)00633-6/fulltext (last accessed Sept. 18, 2023).
[2] https://www.regulations.gov/docket/FDA-2007-P-0108/document (last accessed Sept. 18, 2023).
[3] https://www.jaci-inpractice.org/article/S2213-2198(15)00318-9/fulltext (last accessed Sept. 18, 2023).
[4] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://truthinadvertising.org/wp-content/uploads/2023/02/Hatton-Hendeles-2015-Citizens-Petition-re-oral-phenylephrine.pdf (last accessed Sept. 15, 2023).

alpha adrenergic stimulation.  The absence of a significant effect on the latter at the higher doses suggest that the concentrations reached are not sufficient to stimulate alpha adrenergic receptors."[5]

31.      On November 4, 2015, another Citizens Petition was filed by two professors at the University of Florida, Dr. Leslie Hendeles, PharmD Professor, Pharmacy and Pediatrics, and Dr. Randy Hatton, PharmD FCCP BCPS Clinical Professor, Department of Pharmacotherapy and Translational Research College of Pharmacy.  The petition asked the FDA "to remove oral phenylephrine from the Final Monograph for OTC nasal decongestant products."[6]  Specifically, the petition asked the FDA to remove Phenylephrine and to remove phenylephrine bitartrate, "both individually and in combination drug products in an effervescent dosage form."[7]

32.      According to the 2015 Citizens Petition, "[t]wo additional studies published in 2009 provide further evidence of the absence of a decongestant effect from the FDA-approved nonprescription does of 10mg," and "PE was not significantly different from placebo in the mean change in subjective nasal congestion scores whereas pseudoephedrine, a positive control in the study, decreased congestion significantly greater than placebo and PE."[8]

**The FDA Advisory Panel's Recent Vote on PE**

33.      Recently, "[t]he FDA held a Non-prescription Drug Advisory Committee meeting … to discuss the effectiveness of oral phenylephrine as an active ingredient in over-the-counter (OTC) cough and cold products that are indicated for the temporary relief of congestion, both as a single ingredient product and in combination with other ingredients."[9]

34.      In doing so, the Panel referenced numerous studies demonstrating that PE is not effective for treating nasal congestion when taken orally.

35.      As a result, the Panel concluded that "the current scientific data do[es] not support that the recommended dosage of orally administered phenylephrine is effective as a nasal

---

[5] *Id.*
[6] https://truthinadvertising.org/wp-content/uploads/2023/02/Hatton-Hendeles-2015-Citizens-Petition-re-oral-phenylephrine.pdf (last accessed Sept. 18, 2023).
[7] *Id.*
[8] *Id.*
[9] https://www.fda.gov/drugs/drug-safety-and-availability/fda-clarifies-results-recent-advisory-committee-meeting-oral-phenylephrine (last accessed Sept. 15, 2023).

decongestant."[10]

36.    In fact, the Panel members voted unanimously (16-0) that PE drugs were ineffective when taken orally.

***Misbranded Drugs Are Illegal to Sell***

37.    As OTC drug products regulated by the FDA, the Product must be both safe *and* effective and are subject to federal current Good Manufacturing Practices ("cGMP") regulations and the FDCA's state law analogues.    These cGMP regulations require OTC medications like the Products to meet safety, quality, purity, identity, and strength standards. *See* 21 U.S.C. § 351(a)(2)(B).

38.    The cGMPs establish "minimum current good manufacturing practice for methods to be used in, and the facilities or controls to be used for, the manufacture, processing, packing, or holding of a drug to assure that such drug meets the requirements of the act as to safety, and has the identity and strength and meets the quality and purity characteristics that it purports or is represented to possess." 21 C.F.R. § 210.1(a).    In other words, manufacturers, like Defendants, at all phases of the design, manufacture, and distribution chain are bound by these requirements.

39.    The cGMPs set forth minimum standards regarding: organization and personnel (Subpart B); buildings and facilities (Subpart C); equipment (Subpart D); control of components and drug product containers and closures (Subpart E); production and process controls (Subpart F); packaging and label controls (Subpart G); holding and distribution (Subpart H); laboratory controls (Subpart I); records and reports (Subpart J); and returned and salvaged drug products (Subpart K). The FDA has worldwide jurisdiction to enforce these regulations if the facility is making drugs intended to be distributed in the United States.

40.    Any drug product not manufactured in accordance with cGMPs is deemed "adulterated" or "misbranded" and may not be distributed or sold in the United States. *See* 21 U.S.C. §§ 331(a), 351(a)(2)(B).    States have enacted laws adopting or mirroring these federal standards.

---

[10] https://www.fda.gov/drugs/drug-safety-and-availability/fda-clarifies-results-recent-advisory-committee-meeting-oral-phenylephrine (last accessed Sept. 15, 2023).

41.     FDA regulations require a drug product manufacturer to have "written procedures for production and process control designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess." 21 C.F.R. § 211.100.

42.     A drug product manufacturer's "[l]aboratory controls shall include the establishment of scientifically sound and appropriate specifications, standards, sampling plans, and test procedures designed to assure that components, drug product containers, closures, in-process materials, labeling, and drug products conform to appropriate standards of identity, strength, quality, and purity." 21 C.F.R. § 211.160.

43.     "Laboratory records shall include complete data derived from all tests necessary to assure compliance with established specifications and standards, including examinations and assays" and a "statement of the results of tests and how the results compare with established standards of identity, strength, quality, and purity for the component, drug product container, closure, in-process material, or drug product tested." 21 C.F.R. § 211.194(a)(6).

44.     Defendant could have avoided any potential for misrepresenting the quality characteristics that it represented the Product possessed by testing the effectiveness of PE in the Product for the purported claims on the Product's labeling.

45.     The ineffectiveness of PE in the Product renders the Product both adulterated and misbranded under the FDCA. The Product is adulterated because it is "drug[s] and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess." 21 U.S.C. § 351(a)(1).

46.     The Product is misbranded because its labeling is "false" and "misleading" because it does not alleviate nasal congestion. 21 U.S.C. § 352(a)(1).

47.    A product that is "adulterated" or "misbranded" cannot legally be manufactured, advertised, distributed, or sold.  21 U.S.C. § 331(a).  Adulterated and misbranded products thus have no economic value and are legally worthless.

48.    As alleged herein, Defendant has violated the FDCA, California's Consumers Legal Remedies Act ("CLRA"), California's Unfair Competition Law ("UCL"), California's False Advertising Law ("FAL"), and consumer protection statutes.  Defendant engaged in fraudulent, unfair, deceptive, misleading, and/or unlawful conduct stemming from its misrepresentations and omissions surrounding the quality and purity characteristics affecting the Product.

49.    If Defendant had disclosed to Plaintiff and putative Class Members that the Product does not have the quality characteristics that it purports or is represented to possess, Plaintiff and putative Class Members would not have purchased the Product or they would have paid less for the Product.

50.    As a seller of an OTC drug product, Defendant had and has a duty to ensure that its Product has the identity and strength and meets the quality characteristics that it purports or is represented to possess, including through regular testing, especially before the Product is injected into the stream of commerce for consumers to use on their bodies.  But based on the FDA Panel's conclusions set forth above, Defendant made no reasonable effort to test its Product for the nasal decongestant claims it made.  Nor did it disclose to Plaintiff in any advertising or marketing that the Product did not conform to the nasal decongestant claims it purported or represented to possess.  To the contrary, Defendant represented and warranted, expressly and impliedly, that the Product was of merchantable quality, complied with federal and state law, and did have the identity and strength and meet the quality characteristics that it purports or is represented to possess.

***Injuries to Plaintiff and Class Members***

51.    When Plaintiff purchased Defendant's Product, Plaintiff did not know, and had no reason to know, that Defendant's Product did not have the identity and strength and meet the quality characteristics that it purported to possess (*i.e.*, the ability to alleviate nasal congestion).  Not only would Plaintiff not have purchased Defendant's Products had Plaintiff known the Product did not have

the ability to alleviate nasal congestion, but Plaintiff would also not have been capable of purchasing them if Defendant had done as the law required and tested the Product for its ability to alleviate nasal congestion.

52.     Consumers lack the ability to test or independently ascertain or verify whether a product has the identity and strength and meets the quality characteristics that it purports to possess, especially at the point of sale, and therefore must rely on Defendant to truthfully and honestly report what the Product can do on the Product's packaging or labels.

53.     Further, given Defendant's position in the health and medication market as an industry leader, Plaintiff and reasonable consumers trusted and relied on Defendant's representations and omissions regarding the ability to alleviate nasal congestion in the Product.

54.     Yet, when consumers look at the Product's packaging, the Product is represented as having the ability to alleviate nasal congestion. This leads reasonable consumers to believe the Product has the ability to alleviate nasal congestion.

55.     No reasonable consumer would have paid any amount for products that do not have the ability to alleviate nasal congestion, when the Product is marketed to consumers as having the ability to alleviate nasal congestion.

56.     Thus, if Plaintiff and Class members had been informed that Defendant's Product does not have the ability to alleviate nasal congestion, they would not have purchased or used the Product, or would have paid significantly less for the Product, making such omitted facts material to them.

57.     Defendant's false, misleading, omissions, and deceptive misrepresentations regarding the Product's ability to alleviate nasal congestion are likely to continue to deceive and mislead reasonable consumers and the public, as it has already deceived and misled Plaintiff and the Class Members.

58.     Plaintiff and Class members bargained for a Product that has the ability to alleviate nasal congestion. Plaintiff and Class members were injured by the full purchase price of the Product because the Product is worthless, as it does not have the ability to alleviate nasal congestion, and

Defendant failed to warn consumers of this fact.  Such illegally sold products are worthless and have no value.

59.     As alleged above, Plaintiff and Class members' Product does not have the ability to alleviate nasal congestion, despite the Product's representations to the contrary.

60.     Plaintiff and Class members are further entitled to statutory and punitive damages, attorneys' fees and costs, and any further relief this Court deems just and proper.

## CLASS ALLEGATIONS

61.     Plaintiff, individually and on behalf of all others, brings this class action pursuant to Fed. R. Civ. P. 23.

62.     Plaintiff seeks to represent a class defined as:

> All persons who purchased Defendant's Product in the United States for personal or household use within any applicable limitations period ("Nationwide Class").

63.     Plaintiff also seeks to represent a subclass defined as:

> All persons who purchased Defendant's Product in California for personal or household use within any applicable limitations period ("California Subclass").

64.     Excluded from the Class and Subclass are: (1) any Judge or Magistrate presiding over this action and any members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees, officers, and directors; and (3) individuals who allege personal bodily injury resulting from the use of the Product.

65.     Plaintiff reserves the right to modify, change, or expand the definitions of the Class and/or Subclass based upon discovery and further investigation.

66.     *Numerosity*: The Class is so numerous that joinder of all members is impracticable. The Class likely contains thousands of members based on publicly available data. The Class is ascertainable by records in Defendant's possession.

67.     *Commonality*: Questions of law or fact common to the Class include, without limitation:

- Whether the Product has the ability to alleviate nasal congestion;
- Whether a reasonable consumer would consider the Product's inability to alleviate nasal congestion to be material;
- Whether Defendant knew or should have known that the Product does not have the ability to alleviate nasal congestion;
- Whether Defendant misrepresented whether the Product has the ability to alleviate nasal congestion;
- Whether Defendant failed to disclose that the Product does not have the ability to alleviate nasal congestion;
- Whether Defendant concealed that the Product does not have the ability to alleviate nasal congestion;
- Whether Defendant engaged in unfair or deceptive trade practices;
- Whether Defendant violated the state consumer protection statutes alleged herein;
- Whether Defendant was unjustly enriched; and
- Whether Plaintiff and Class members are entitled to damages.

68.     *Typicality*: Plaintiff's claims are typical of the claims of Class members. Plaintiff and Class members were injured and suffered damages in substantially the same manner, have the same claims against Defendant relating to the same course of conduct, and are entitled to relief under the same legal theories.

69.     *Adequacy*: Plaintiff will fairly and adequately protect the interests of the Class and have no interests antagonistic to those of the Class.  Plaintiff has retained counsel experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case.  Counsel intends to vigorously prosecute this action.

70.     *Predominance and superiority*: Questions of law or fact common to Class members predominate over any questions affecting individual members.  A class action is superior to other

available methods for the fair and efficient adjudication of this case because individual joinder of all Class members is impracticable and the amount at issue for each Class member would not justify the cost of litigating individual claims.  Should individual Class members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments.  In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

71.     Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

**COUNT I**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On behalf of Plaintiff and the California Subclass)**

72.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

73.     Plaintiff brings this Count on behalf of himself and the California Subclass against Defendant.

74.     The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising…." Cal. Bus. & Prof. Code § 17200.

***Fraudulent Acts and Practices***

75.     Any business act or practice that is likely to deceive members of the public constitutes a fraudulent business act or practice under the UCL. Similarly, any advertising that is deceptive, untrue or misleading constitutes a fraudulent business act or practice under the UCL.

76.     Defendant has engaged in conduct that is likely to deceive members of the public. This conduct includes representing on its Product's labels that its Product has the ability to alleviate nasal congestion.

77.     As alleged above, Defendant has engaged in deceptive, untrue, and misleading advertising by making representations regarding the quality of the Product and material omissions regarding the Product's ability to alleviate nasal congestion.

78.     Plaintiff and the putative Class members were exposed to one or more of these representations and/or omissions during the class period and relied on one or more of these representations and/or omissions in deciding to purchase Defendant's Product.  Indeed, although the Product was found to not have the ability to alleviate nasal congestion, Defendant makes representations on the Product's packaging and labels to the contrary. Again, such misrepresentations and omissions mislead consumers regarding the quality of the Product.

79.     By committing the acts alleged above, Defendant has engaged in fraudulent business acts and practices, which constitute unfair competition within the meaning of Business & Professions Code §17200.

### *Unlawful Acts and Practices*

80.     The violation of any law constitutes an unlawful business practice under Business & Professions Code §17200.

81.     Defendant's conduct also violates Cal. Health & Safety Code § 111730, which prohibits the sale of any misbranded product. By selling a Product that does not accurately reflect the quality of the Product, the labeling is "false and misleading in any particular" in violation of Health & Safety Code § 111730.

82.     By violating Cal. Health and Safety Code § 111730, Defendant has engaged in unlawful business acts and practices which constitute unfair competition within the meaning of Cal. Bus. & Prof. Code § 17200.

### *Unfair Acts and Practices*

83.     Any business practice that offends an established public policy or is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers constitutes an "unfair" practice under the UCL.

84.     Defendant has engaged in unfair business practices. This conduct includes representing that the Product has the ability to alleviate nasal congestion.

85.     Defendant has engaged in conduct that violates the legislatively declared policies of the FTC Act against committing unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce.  Defendant gained an unfair advantage over its competitors, whose advertising for products must comply with the FTC Act.

86.     Defendant's conduct, including misrepresenting the qualities of the Product, is substantially injurious to consumers.  Plaintiff and the Class would not have paid for nasal decongestant products that do not have the ability to alleviate nasal congestion but for Defendant's false labeling, advertising, and promotion.  Thus, Plaintiff and the putative Class have "lost money or property" as required for UCL standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

87.     Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's representation of the qualities described in the Product's labels and injury resulted from ordinary use of the Product, consumers could not have reasonably avoided such injury.

88.     By committing the acts described above, Defendant has engaged in unfair business acts and practices which constitute unfair competition within the meaning of the UCL.

89.     As a result of the conduct described above, Defendant has been unjustly enriched at the expense of the Plaintiff and the putative Class.

90.     An action for restitution is specifically authorized under Cal. Bus. & Prof. Code 17203.

91.     Wherefore, Plaintiff prays for judgment against Defendant, as set forth hereafter. Defendant's conduct with respect to the labeling, advertising, marketing, and sale of the Product is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

92.     On behalf of Plaintiff and the putative Class, Plaintiff seeks an order for the restitution of all monies spent on the Product, which were acquired through acts of fraudulent, unfair, or unlawful competition.   In addition, because the Product admittedly does not have the ability to alleviate nasal congestion, the measure of restitution should be rescission and full refund insofar as the Product is worthless.   But for Defendant's misrepresentations and omissions, Plaintiff would have paid nothing for Product that does not have the ability to alleviate nasal congestion.   Indeed, there is no discernible "market" for an OTC nasal decongestant that does not have the ability to alleviate nasal congestion.   As a result, the Product is rendered valueless.

93.     Plaintiff and California Subclass Members have no adequate remedy at law for this claim.   Plaintiff pleads his claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

94.     Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief.   *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

### COUNT II
### VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW
### Cal. Bus. & Prof. Code § 17500, *et seq.*
### (On behalf of Plaintiff and the California Subclass)

95.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     Plaintiff brings this Count on behalf of himself and the California Subclass against Defendant.

97.     California's False Advertising Law prohibits any statement in connection with the sale of goods "which is untrue or misleading." Cal. Bus. & Prof. Code §17500.

98.     As set forth herein, Defendant's marketing claim that its Product is able to provide relief to "Nasal Congestion," is untrue and misleading.  To the contrary, the Product does not have the ability to alleviate nasal congestion.

99.     Defendant knew, or reasonably should have known, that its claims regarding the quality of its Product and/or omissions regarding the Product's inability to alleviate nasal congestion were untrue or misleading.

100.    Plaintiff and members of the California Subclass are entitled to monetary relief, and restitution in the amount they spent on the Product.

101.    Plaintiff and California Subclass Members have no adequate remedy at law for this claim.  Plaintiff pleads his claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

102.    Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief.  *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

## <u>COUNT III</u>
### VIOLATIONS OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT
#### Cal. Bus. & Prof. Code § 1750, *et seq.*
#### (On behalf of Plaintiff and the California Subclass)

103.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

104.    Plaintiff brings this Count on behalf of himself and the California Subclass against Defendant.

105.    Defendant has employed or committed methods, acts, or practices declared unlawful by Cal. Civ. Code §1770 in connection with the Product.

106.    In particular, by failing to inform consumers that the Product does not have the ability to alleviate nasal congestion, Defendant has violated the following provisions under California Civil Code § 1770(a):

> (5) by representing that the Product has characteristics, uses and/or benefits which it does not;
>
> (7) by representing that the Product was of a particular standard, quality, or grade which it is not; and
>
> (9) by advertising the Product with intent not to sell it as advertised.

107.    Plaintiff and California Subclass Members have no adequate remedy at law for this claim.  Plaintiff pleads his claim for equitable relief in the alternative, which inherently would necessitate a finding of no adequate remedy at law.

108.    Alternatively, legal remedies available to Plaintiff are inadequate because they are not "equally prompt and certain and in other ways efficient" as equitable relief.  *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*, 815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014 Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate, and efficacious to the end in view … It must reach the whole mischief and secure the whole right of the party in a perfect manner at the present time and not in the future.").

109.    Wherefore, Plaintiff, on behalf of himself and all other members of the Class seeks to enjoin the unlawful acts and practices described herein.  Plaintiff reserves the right to request

1    amendment of this complaint to include a request for damages under the CLRA after complying

2    with Civil Code 1782(a).

3                                              **COUNT IV**
                                **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
4                                **(On behalf of Plaintiff and the Nationwide Class)**

5           110.    Plaintiff repeats and realleges each and every allegation contained in the foregoing

6    paragraphs as if fully set forth herein.

7           111.    Plaintiff brings this claim on behalf of himself and the Nationwide Class against

8    Defendant.

9           112.    At all times relevant all fifty States and the District of Columbia and Puerto Rico have

10   codified and adopted the provisions of the Uniform Commercial Code governing the implied

11   warranty of merchantability and fitness for ordinary purpose.

12          113.    Defendant was at all times a "merchant" within the meaning of Article 2 of the

13   U.C.C., as codified under applicable law.

14          114.    The Product is and was a good within the meaning of Article 2 of the U.C.C., as

15   codified under applicable law.

16          115.    Defendant was obligated to provide Plaintiff and the other Class Members a Product

17   that was of merchantable quality, was reasonably fit for the purpose for which they were sold, and

18   confirmed to the standards of the trade.

19          116.    Defendant impliedly warranted that those drugs were of merchantable quality and fit

20   for that purpose.

21          117.    Defendant breached its implied warranties, because the Product was not of

22   merchantable quality or fit for their ordinary purpose.

23          118.    Defendant's breaches of implied warranties were a direct and proximate cause of

24   Plaintiff's and the other Class members' damages.

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT V**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff and the Nationwide Class)**

119.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

120.    Plaintiff brings this Count on behalf of Plaintiff and the Nationwide Class against Defendant.

121.    This claim is brought under the laws of the State of California.

122.    Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, marketing, and selling the Product while misrepresenting and omitting material facts.

123.    Defendant's unlawful conduct allowed Defendant to knowingly realize substantial revenues from selling the Product at the expense of, and to the detriment or impoverishment of, Plaintiff and Class members and to Defendant's benefit and enrichment. Defendant has thereby violated fundamental principles of justice, equity, and good conscience.

124.    Plaintiff and Class members conferred significant financial benefits and paid substantial compensation to Defendant for the Products, which were not as Defendant represented them to be.

125.    Defendant knowingly received and enjoyed the benefits conferred on it by Plaintiff and Class members.

126.    It is inequitable for Defendant to retain the benefits conferred by Plaintiff and Class members' overpayments.

127.    Plaintiff and Class members seek establishment of a constructive trust from which Plaintiff and Class members may seek restitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, prays for relief and judgment against Defendant as follows:

1

2

- Certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representatives of the Class and Subclasses, and designating Plaintiff's counsel as Class Counsel;

3

4

- Awarding Plaintiff and Class members compensatory damages, in an amount to be determined at trial;

5

6

- Awarding Plaintiff and Class members appropriate relief, including but not limited to actual damages;

7

- For restitution and disgorgement of profits;

8

9

- Awarding Plaintiff and Class members reasonable attorneys' fees and costs as allowable by law;

10

- Awarding pre-judgment and post-judgment interest;

11

- For punitive damages; and

12

- Granting any other relief as this Court may deem just and proper.

13

## **DEMAND FOR JURY TRIAL**

14

Plaintiff hereby demands a jury trial on all issues so triable as of right.

15

16

Dated:  October 19, 2023                          Respectfully submitted,

17

**BURSOR & FISHER, P.A.**

18

19

By:_____*/s/ Sarah N. Westcot*_____
              Sarah N. Westcot

20

21

22

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 1420
Miami, FL  33131-2800
Telephone: (305) 330-5512
Facsimile:  (305) 676-9006
E-Mail: swestcot@bursor.com

23

24

25

26

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com

27

*Counsel for Plaintiff*

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Sarah N. Westcot, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court.  I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiff. Plaintiff Flores resides in San Jose, California.  I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.      The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California, as Plaintiff purchased his Product within this District.  Additionally, Defendant advertised, marketed, manufactured, distributed, and/or sold the Product at issue to Class Members from this District.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct and that this declaration was executed at Miami, Florida this 19th day of October, 2023.


  */s/ Sarah N. Westcot*
Sarah N. Westcot